## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| W.R. HUFF ASSET MANAGEMENT CO., L.L.C.; KATO-SAN CORP.; DBC 1 CORP., <br><br> Plaintiffs, <br><br> v. | Civ. Action No. 04-3093 (KSH) |
| THE WILLIAM SOROKA 1989 TRUST; KAYE WOLTMAN, *successor trustee to the William Soroka 1989 Trust and Executor of the Estate of William Soroka*; THE WILLIAM SOROKA CHARITABLE TRUST, <br><br> Defendants. | **OPINION** |

**KATHARINE S. HAYDEN, U.S.D.J.**

> *Who is rich?  He that is content.  Who is that?  Nobody.*
>
> *~ Benjamin Franklin*
> *Poor Richard's Almanac*

## I.    INTRODUCTION

This litigation evolved from a dispute over the value of an interest in an exclusive and lucrative investment enterprise.  In 1984, a small group of high net worth individuals formed a limited investment partnership in which the general partner, William Huff, actively invested the limited partners' initial capital outlays, then passed on to them the returns those investments generated.  By agreement, the partnership was converted to a limited liability company in 1994

and was slated to terminate ten years later.  Limited to the group of passive investors originally invited to participate, the private venture proved wildly successful, with William Huff and the passive investors reaping steady profits year after year.

At issue in this diversity action is whether the interest of one limited partner, William Soroka ("Soroka"), terminated sometime before the venture's 2004 end date when, as part of his estate planning, Soroka attempted to pass his interest to a trust containing a non-member beneficiary without first offering it to the rest of the membership, in violation of the group's formal agreement.

Plaintiff, W.R. Huff Asset Management Co., L.L.C. ("Huff"),[1] initiated this declaratory judgment action in New Jersey Superior Court, Chancery Division, against the defendants, the William Soroka 1989 Trust (the "Trust" or the "1989 Trust"), the Estate of William Soroka (the "Soroka estate"), and Kaye Woltman ("Woltman"), in her capacity as trustee and executor of the Soroka Trust and Estate, respectively.[2]  Specifically, plaintiff seeks a declaration that defendants are not entitled to a complete distribution of Soroka's share of Huff, and requests the return of certain distributions paid into the trust that Soroka created.  For their part, defendants seek payments from Huff that they claim are still owed by way of distributions, arguing that Soroka's interest survived until the termination of the investment enterprise.  According to defendants, Woltman is entitled, as executor of the Soroka estate, to a full distribution of his capital account as it stood on the termination date of the company.  Additionally, the parties dispute which of

---

[1] Kato-San Corp. and DBC 1 Corp., corporate general managers of Huff, are also named as plaintiffs in the complaint.  See Compl. ¶ 5; Ex. P-1 at 35.  For simplicity, the Court refers in this opinion only to plaintiff Huff.

[2] Woltman was originally named as a defendant in her individual capacity as well, but plaintiff has since withdrawn claims against her to that extent [D.E. # 90].

two generally accepted accounting methods should govern the final distribution of Soroka's capital account.

After careful consideration and for the following reasons, the Court finds for plaintiff in part and for defendants in part.

## II.   JURISDICTION & PROCEDURAL HISTORY

Plaintiff filed suit in state court seeking:   (1) a judgment declaring the transfer of Soroka's interest in Huff to his personal trust to be in violation of the Huff Operating Agreement ("Operating Agreement"); (2) a determination of the balance of Soroka's capital account on the date of the purported transfer; (3) a declaration that Soroka is entitled to that balance and nothing more; (4) and costs and attorney's fees.   Defendants properly removed the case to federal court on diversity grounds [D.E. # 1], see 28 U.S.C. § 1441(a); 28 U.S.C. § 1332(a), and thereafter answered and counterclaimed against plaintiff seeking an accounting of Soroka's capital account and payment of profits withheld after the first quarter of 2003.   [D.E. # 2].   Additionally, defendants sought a declaration that no violation of the Operating Agreement occurred as a result of the attempted transfer of Soroka's interest, or in the alternative that plaintiff was estopped from objecting to the transfer.   [D.E. # 2].   Finally, the counterclaim asked the Court to require that distributions be made to Woltman for the duration of the company's life, pursuant to the Operating Agreement.   After an evidentiary hearing on the admissibility of a version of the Operating Agreement proffered by defendants, the Court conducted a bench trial.

## III.   STANDARD OF REVIEW & APPLICABLE LAW

As stated above, both parties seek a declaration of their respective rights vis-à-vis Soroka's interest (the "Soroka Interest") in Huff.  The Operating Agreement contains a choice of law clause stipulating that Delaware law shall govern the parties' substantive rights.  Ex. P-1 at

1, 5, 31.  Thus, the Court will apply Delaware contract law.  In doing so, however, the Court applies the federal Declaratory Judgment Act in deciding whether and to what extent declaratory relief is warranted under the Operating Agreement, as interpreted using Delaware's substantive doctrines.  See Fed. Kemper Ins. Co. v. Rauscher, 802 F.2d 345, 352 (3d Cir. 1986) ("It is settled law that, as a procedural remedy, the federal rules respecting declaratory judgment actions apply in diversity cases.").  That Act states:

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of the appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a).  Depending on the particular context, a declaratory judgment can either be legal or equitable in nature.  See Township of Haddon v. Royal Ins. Co. of Am., 929 F. Supp. 774, 777 (D.N.J. 1996).  When determining whether legal or equitable principles reign, a court must look to the historical basis for the cause of action and focus on the requested relief.  Id. at 777-78.  Where the remedy sought is damages, courts may rightly conclude that the relief is legal in nature.  Conversely, where a party is seeking an injunction, restitution, or specific performance, the remedy is ordinarily equitable.  Id.

The Court will exercise its powers in equity.  While a declaratory judgment action may ultimately result in the payment of money, it is not by necessity one at law.  See id.  In this case, the relief sought is more aptly characterized as specific performance (or arguably, termination) of the contract.  Plaintiff believes that its obligations under the group's Operating Agreement concluded upon Soroka's alleged breach and that it is entitled to purchase the Soroka Interest at the value as it stood when Soroka breached the agreement.  Defendants, on the other hand,

4

contend that plaintiff owed a continuing duty to make distributions, per the terms of the agreement, until the venture culminated in 2004. This action was initially filed in a New Jersey court of equity, both parties submitted to a non-jury trial, and thereafter urged the Court in their post-trial submissions to call upon the equities in resolving the dispute. The Court agrees that, to the extent consistent with traditional maxims of contractual interpretation, it is empowered to incorporate considerations of fairness and justice into its analysis.

## IV.    FINDINGS OF FACT

The Court heard testimony from the architects of, and central participants in, the Huff investment vehicle. These key fact witnesses were: William Huff,[3] founder and principal investor in the company; Josephine Carbone, a long-time employee at Huff whose responsibilities included issuing quarterly checks to the members reflecting their shares in the venture's profits; Joseph Thornton, counsel for Huff and a principal drafter of the company's governing document; Stephen Bassock, a founding member of Huff; Bryan Bloom, in-house counsel at Huff; and Woltman, the executor of Soroka's estate and a defendant in this lawsuit. Mark Gallagher, C.P.A. and Michael Gavin¸ C.P.A. provided expert testimony for plaintiff and defendants, respectively.

While the facts adduced at trial have obviously provoked impassioned disagreement over the interpretation of the Operating Agreement and the ultimate resolution of the case, the background facts are straightforward and largely undisputed. The following factual findings are established from the trial record, consisting of trial testimony, exhibits, and stipulated facts.[4]

---

[3] As stated above, the Court refers to the Huff LLC as "Huff." For clarity, the Court will refer to William Huff using his full name.

[4] Transcript citations refer to the three volumes produced from the three-day trial. The first number in each citation corresponds with the particular volume. Citations to exhibits refer to the joint post-trial appendix submitted by the parties.

### A. The Original Partnership

1. Background

William Huff, a talented investment advisor, testified that he left his job at a Wall Street investment advisory firm in 1984 in order to start his own investment company. (1T:24:20-25). Needing seed capital, he approached a friend, Spencer Brainard ("Brainard"), who introduced him to several high net worth individuals, including Steven Bassock ("Bassock") and Arthur Paturick ("Paturick"). (1T:25:2-14). These and other individuals executed a limited partnership agreement on December 8, 1984 (the "1984 Agreement"), with William Huff acting as general partner and each limited partner passively investing approximately $32,000. (1T:12:7-8). Including William Huff, ten individuals comprised the original partnership. (Ex. P-8 at 30-31). Once a quarter, the members would receive a check from the Huff partnership reflecting their respective shares in the profits William Huff's investments generated. Under the agreement, the partnership would dissolve on December 31, 2004. (Ex. P-8 at 6). William Huff testified that most of the members of the group were employed by Bassock and Paturick, and the partnership interest was intended to be a "perk" of that employment. (1T:27:20-25). He further explained that Soroka was not one of these employees, however, and that he had never met the man. (1T:29:2-6). William Huff stated that unlike the other limited partners, Soroka became a member of the limited partnership through his personal friendship with Paturick. (1T:27:24-28:2; 1T:29:2-6).

Woltman testified that in 1989, the partnership offered to buy out Soroka's and two other members' interest at a profitable price. She explained that Soroka, acting on her advice, rejected the offer and continued to receive his payments. (3T:122:24-125:6). Woltman further testified that Soroka felt that he was under pressure to accept the buyout; there is, however, no dispute

that under the 1984 Agreement, neither he nor any other partner was obligated to accept such an offer, and he was free to continue on as a full member in the venture.  (3T:124:7-125:7).

William Huff testified that with the exception of Soroka, who was somewhat of an outsider, the investment venture was made up of a "very, very tight-knit group of basically friends and family."  (1T:28:2-4).   Besides the personal connections, there was a business reason for the tight circle:  William Huff explained that "given the nature of the business that [he] was doing," he wanted to operate with anonymity and avoid regulatory restrictions by keeping the partnership "close and tight."  (1T:28:6-29:1).   This partnership structure kept William Huff insulated from his passive investors and left him in complete control over the investments.  He testified further that Bassock and Paturick established themselves as "stewards" of the limited partners, providing a buffer for channeling partnership business, what little there was, between him and the investors.  (1T:30:13-24).   His sole responsibility was to "make money for the firm." (1T:30:16-17).   And he made a lot of it, increasing his and the limited partners' capital accounts many times over.  (1T:12:7-9).

### 2.   The 1984 Limited Partnership Agreement

Two provisions contained in the 1984 Agreement are directly relevant to this case.  First, § 8.2(A) states:

> No Limited Partner's Interest or any fraction thereof may be sold, assigned, transferred or withdrawn without first offering such Interest to the other Limited Partners at a price equal to the balance in such Limited Partner's Capital Account at that time.  Any such interest or fraction thereof shall first be offered to all other Limited partners pro rata, and any such pro rata portion thereof for any Limited Partner(s) who do not elect to purchase a share shall be likewise offered to the membership pro rata.  All or any portion of an Interest which a Limited Partner seeks to sell, assign, transfer or withdraw and which is not purchased by one or more of the other Limited Partners shall thereafter be offered to the General Partners pro rata, also at a price equal to the balance in such Limited

> Partner's Capital Account at that time.  Thereafter, all or any portion of an Interest which a Limited Partner seeks to sell, assign, transfer or withdraw and which is not purchased by any other Partner shall either (i) be "sold" to the Partnership by permitting such Limited Partner to withdraw from the Partnership . . . or (ii) with the consent of two-thirds of the then Limited Partners, may be sold, assigned, or transferred to any other Person other than a Partner at that time.

(Ex. P-8 at 22-23).  The import of this provision is self-evident:  William Huff and the original investors wanted to maintain a tight circle of partners.  To that end, they restricted unilateral alienation of interests by giving the partnership a right of first refusal before a member could transfer his or her interest to an outsider.  William Huff testified that the original intent of the partnership was to allow a member to convey his or her interest only to a spouse or child.  (1T:53:11-14).  While nothing in the 1984 Agreement literally permits such a transfer to family members, William Huff testified that he had a "handshake agreement" with Bassock and Paturick that such transfers would be permissible.  (1T:53:21-54:11).

Second, § 10.2 of the 1984 Agreement states: "The books of the Partnership shall be kept on an accrual basis."[5]  (Ex. P-8 at 27).  Despite this language, William Huff clarified at trial that the books of the partnership were actually kept on a cash basis, because given "the nature of the business . . . accrual accounting ma[de] very little sense" since the partnership was a "cash business."  (1T:42:18-20).  He further stated that when the partnership was converted to a limited liability company in 1994 (see infra Section III.B), the Operating Agreement was specifically changed to require cash method accounting to "reflect . . . the practice that actually happened since 1984 . . . ."  (1T:49:9-11).  The partnership also prepared its tax returns and made all quarterly distributions using the cash method. (1T:43:18-44:19).  William Huff

---

[5] Under "cash method" accounting principles, revenues and expenses are recorded only when they are actually received or deducted.  Under the "accrual method," revenues and expenses are recorded when they are first earned or incurred.

explained that the partnership did, however, keep an ongoing accounting of receivables on an accrual basis as an internal forecasting tool to reflect how much money the firm was making. (1T:43:4-17).

### B.  The 1994 Conversion to Limited Liability Company Status

1.  <u>Background</u>

In 1994, William Huff circulated a memorandum to the limited partners expressing concern with the partnership's "potential exposure to third party suits and other asset protection issues." (Ex. P-11 at 1).  The memorandum stated that limited partners are commonly named as parties in a lawsuit, and that if a factfinder were to determine that their level of activity in the business was that of a general partner, their "limited" liability would be "porous." (<u>Id.</u>). Additionally, the memorandum stated that the 1984 Agreement was out of date with respect to the law of indemnification, exculpation, and advancement. (<u>Id.</u>).  To respond to these concerns, the memorandum proposed that the limited partnership be converted to a limited liability company, a particular corporate designation that had recently been recognized by the New Jersey Legislature. (<u>Id.</u> at 2).

This conversion, the memorandum continued, would provide greater protection to the members because they would be treated more like "shareholders of a corporation" in terms of liability exposure.  (<u>Id.</u>).  The memorandum then outlined the major revisions to the organization. A few of the most significant and relevant proposed changes in the memorandum were:  (1) the new agreement exculpated all members from liability in every situation permitted by law; (2) the indemnification provisions were updated to then-current legal standards; (3) members would be able to transfer their interests to family members and affiliates (like family trusts); and (4) cash method accounting would be substituted to reflect the actual practice of the company.  (<u>See id.</u> at

2-5).  The memorandum closed by stating, "We want to emphasize that none of the changes affects the distribution or equity interest rights of the business."  (Id. at 5).  The proposal was unanimously ratified and the limited partnership was successfully converted into the Huff LLC on July 27, 1994.  (Ex. P-7).[6]

> ### 2.  Provisions of the Operating Agreement

The Operating Agreement contains several provisions which frame the central dispute between the parties.   These provisions, all contained within Article Eight, entitled "Transferability of Member's Interests," are reproduced and discussed below.

Section 8.1, a preamble of sorts, states:

> (A) Each Member hereby represents and warrants to each General Manager and to the Company that his acquisition of his Interest is made as principal for his own account for investment purposes only and not with a view to the resale or distribution of such interest.

> (B) Each Member agrees that he will not sell, assign, pledge, hypothecate, place in trust or otherwise transfer ("Transfer") his Interest or any fraction thereof *as otherwise permitted under this Agreement* unless the Interests have been registered under the Securities Act, or such Transfer is exempt from such registration and, in any event, he will not Transfer his Interest or any fraction thereof to any Person who does not similarly represent and warrant and similarly agree not to Transfer such Interest or fraction thereof to any Person who does not so represent and warrant and agree. *Any such attempted Transfer in violation hereof is void*.

(Ex. P-1 at 22-23) (emphasis added).

---

[6] Defendants argued before trial that the process by which the limited members gave their consent was flawed, and that there was another version of the Operating Agreement with language that benefited their position regarding Soroka's financial interest in the company upon his death.   The Court has previously ruled against the defendants on this point [D.E. # 67].

Section 8.2, labeled "Restrictions on Transfers of Interests," lies at the heart of the parties' dispute; it places additional constraints on the alienability of membership interests. Section 8.2(A) states:

> *No member's Interest or any fraction thereof may be transferred or withdrawn without first offering such interest to all of the other members at a price equal to the balance in such member's capital account at that time.* Any such interest or fraction thereof shall first be offered to all of the other members pro rata, and any such pro rata portion thereof for any members who do not elect to purchase a share shall be likewise offered to the remaining members pro rata. All or any portion of an Interest which a Member seeks to Transfer or withdraw and which is not purchased by any other Member shall either: (i) be Transferred to the Company by permitting such Member to withdraw from the Company pursuant to Article Seven of this Agreement; or (ii) *with the consent of the General Managers and of Members holding two-thirds of the Interests*, which consent may be withheld in their complete discretion, may be Transferred to any other Person other than a Member for any price, provided that in determining the requisite consent, there shall be excluded the Interest of the transferring Member and, if such Member is also a General Manager, the consent of such General Manager.

(Id. at 23-24) (emphasis added). This provision reincorporates the material aspects of § 8.2(A) of the original partnership agreement, and thus preserves the restrictions on free alienation of interests and the group's desire for exclusivity. The very next provision of the Operating Agreement, however—§ 8.2(B)—is not contained in the original agreement. It reads:

> Notwithstanding the foregoing, Section 8.2(A) shall not apply to the *assignment by a Member of his right to share in profits with respect to his Interest* to a spouse or lineal descendant (each, a "Family Member"), a trust for the benefit of one or more Family Members, or a partnership comprised solely of Family Members; provided, however, that such assignee shall not be admitted to the Company as a Member unless the consent requirements set forth in clause (ii) of Section 8.2(A) shall have been satisfied (except as provided in Section 8.3(A)).

(Id. at 24) (underline in original; italics added for emphasis).  Joseph Thornton ("Thornton"),
Huff's in-house counsel at the time of the conversion to an LLC, who played a key role in
drafting the Operating Agreement, referred to this section as the "the principal change . . . [that]
allow[ed] for . . transfers to family members, trusts for the benefit of families, etc." (2T:7:3-5).
Despite the assignment language, the engineers of the conversion to LLC status evidently
believed that § 8.2(B) was the provision that permitted familial transfers, which William Huff
had referenced in his memorandum proposing the conversion to an LLC.

The next section, § 8.3, dealing with transferees, contains two relevant subsections.  First,
§ 8.3(A), which did not appear in the 1984 limited partnership agreement, states:

> Upon the Incapacity[7] of a Member, his executor, administrator,
> trustee, committee, guardian, conservator, or receiver of his estate,
> as the case may be, shall have all the rights of a Member for the
> purpose of settling or managing his estate, receiving distributions
> of profits and/or losses from the Company and, subject to Section
> 8.2, such power as the Incapacitated member possessed to Transfer
> all or any part of his Interest and to join with such Transferee in
> satisfying conditions precedent to such assignee becoming a
> Substituted Member.

(Ex. P-1 at 24-25).  Under this paragraph, an executor of a deceased member steps into the shoes
of the member himself and retains all rights that the decedent had with respect to his membership
in the company.   These reserved rights include, subject to § 8.2, the power to transfer the
member's interest.  (2T:53:16-54:3).  Upon a member's death, then, § 8.3(A) controls and the
interest resides in the executor.  (2T:54:13-22).  Thornton agreed with this assessment during his
testimony regarding Arthur Paturick death (discussed more fully infra):

> Q:  So between the time Mr. Paturick died and the time the interest was transferred to his
>      estate, where was the interest?

---

[7] It is undisputed that under § 1 of the Operating Agreement, "Incapacity" includes death.  (Ex. P-1 at 4; 2T:53:12-15).

A: My legal opinion?

Q: No.  Is there anything under the agreement where it says the – where the interest was?

A: It resides in the executor.

Q: And the executor has the right to receive profits and losses and also to wind up the affairs of the estate, correct?

A: Yes.

Q: And we had testimony yesterday from Ms. Carbone that the checks to the Paturick estate continued, that's exactly what this provision provides for, that the executor can receive profits and losses?

A: Yes.

(2T:54:13-55:2).

Second, § 8.3(D) deals with the conditions precedent to a valid transfer.  It provides:

> The Company will recognize any purported Transfer of all or any fraction of the Interest of a Member if the provisions of this Article 8 shall have been complied with and there shall have been filed with the Company a written and dated notice of such Transfer, executed and acknowledged by both the Transferor and the Transferee and such notice (i) contains the acceptance by the Transferee of all of the terms and provisions of this Agreement and (ii) represents that such Transfer was made in accordance with this Agreement and all applicable laws and regulations (including suitability standards).  Any Transfer shall be recognized by the Company as effective on the date such notice is filed with the Company.

(Ex. P-1 at 25).  Thornton also acknowledged during his testimony that no transfer occurs, death or otherwise, until the requirements of §§ 8.1 and 8.3(D) have been satisfied:

Q: [Y]ou did understand . . . that notwithstanding the language in § 8.2(B), the interest to be formally transferred to the estate of the member had to be formally voted on and agreed by the members, correct?

A: Yes.  Much like it was with Mr. Paturick.

(2T:51:9-13).

### C.  The Paturick Precedent

From the time the partnership was converted to an LLC until January 1997, no member's interest had ever been transferred to a non-member in accordance with § 8.2(A) or § 8.2(B). Further, there had never been an occasion where it became necessary to invoke § 8.3(A) because no member had died.  Then Arthur Paturick, who was significantly older than the other partners, died, and his executors signed an "Acceptance" in which they accepted to be bound by the terms of the Operating Agreement.  (Ex. P-104).  This Acceptance reads:

> WHEREAS, Arthur Paturick ("Paturick") owned an interest in W.R. Huff Asset Management Co., L.L.C. ("Huff") prior to his death; and

> WHEREAS, the Executors wish to succeed to Paturick's interest for purposes of settling or managing his Estate; and

> WHEREAS, Section 8.3A of the Operating Agreement of Huff (the "Operating Agreement") permits such transfer so long as the Executors agree to be bound by the Operating Agreement.

> NOW, THEREFORE, in consideration of the foregoing, the Executors agree as follows:

> 1.  The Executors agree to be bound by all of the terms and provisions of the Operating Agreement.

> 2.  The Executors agree to execute such further documentation as may be required to carry out the terms of this Acceptance.

(Ex. P-104).  Importantly, the Acceptance, by all accounts, **did not transfer** the interest to the Paturick estate, but merely reaffirmed what was already true—by virtue of § 8.3(A), Paturick's executors had the right to receive the quarterly payments that Paturick would have received had he still been alive.[8] (1T:90:25-91:1).

---

[8] While the Acceptance implies that § 8.3(A) requires such a formality to be signed by the executors, no such requirement appears in the language of that provision.  (Ex. 1 at 24-25).

Then, in 1999, William Huff circulated another memorandum advising the members that since the time the arrangement had last been amended (in 1994), a "number of factors ha[d] changed that necessitate[d] a handful of amendments." (Ex. P-13). Two amendments related to the interest of Donna Charlton, a Huff employee and minority partner. (Id.) The memorandum also referenced "purely ministerial" amendments, one of which related to the passing of Paturick. The memorandum does not provide further detail concerning the Paturick-related amendment. (Id.) In any case, in response to William Huff's memorandum—and 2½ years after Paturick's death—the members unanimously amended the Operating Agreement to formally transfer Paturick's interest to his estate and substitute his estate as a member pursuant to § 8.2(A)(ii). (Ex. P-6). Despite the lack of detail in the memorandum regarding the "Paturick Amendment," Thornton later testified that the purpose of the amendment was "principal[ly] to allow for the succession of Arthur Paturick's estate as a member." (2T:10:19-23).

William Huff testified that he understood the transfer of Paturick's interest to his wife (the beneficiary of his estate) to be consistent with the terms of the Operating Agreement. (1T:36:4-23). He admitted, however, that he was not familiar with the mechanics of the interest transfer, but only knew the "big picture." (1T:36:10-14). Thornton testified that to his knowledge, Paturick never attempted to assign the rights to share in the profits deriving from the interest during his lifetime, and so § 8.2(B) would have nothing to do with the interest passing at his death. (2T:52:4-15). Instead, the Operating Agreement permitted Paturick's executors to manage the interest until the interest could be substituted in as a member pursuant to a two-thirds membership vote. And this is exactly what happened—upon his death, Paturick's executors received the distributions of the Paturick Interest for over two years under § 8.3(A), until the estate became a substituted member under § 8.2(A)(ii).

### D.  The "Transfer" of the Soroka Interest to the Soroka Trust

In 1989, William Soroka executed a revocable declaration of trust in 1989, naming his living trust "The William Soroka 1989 Trust."  (Ex. P-79).  Woltman and her husband acted as trustees of the Trust until 1991, at which time Soroka became sole trustee for approximately ten years.  (3T:62:5-65:20).  In 2001, Woltman was reappointed sole trustee of the 1989 Trust.  It was amended and restated numerous times, but at all times throughout his life, Soroka remained the sole beneficiary of the Trust.

From its inception, the Trust contained specific devises to family members effective upon Soroka's death; the final restated version specifically bequeathed money to his daughter Cynthia and his son Nicholas.  (Ex. P-86).  The residuary beneficiary of the 1989 Trust was a charitable trust entitled The William Soroka Charitable Trust (the "Charitable Trust").  In 1995, Soroka executed his Last Will and Testament, naming Woltman as executor.  (3T:65:21-23; P-72).  The 1989 Trust was intended to be the primary mechanism for disbursing Soroka's assets upon his death—the will contained a pour-over provision devising the entire estate to the 1989 Trust.  (Ex. P-72).  In addition to granting her powers under his will, in January 1999 Soroka also executed a durable power of attorney naming Woltman as his attorney-in-fact, and granting her wide-ranging authority over his financial affairs.  (Ex. P-73).  This power of attorney took effect immediately.

When Soroka received the proposed Paturick Amendment, Woltman signed the form on Soroka's behalf.  (Ex. P-6).  In a cover letter dated September 29, 1999 (the "September 1999 letter"), Woltman requested the following:

Please request Josephine Long to change Mr. Soroka's ownership and address as follows:

> William Soroka, Trustee
> The William Soroka 1989 Trust
> Date August 26, 1989
> % [sic] Kaye Woltman
> 2355 Northside Drive, # 200
> San Diego, CA 92108

All distribution checks should be forwarded to me in the future made payable to Correspondence Services Corporation for the account of William Soroka Trust.

(Ex. P-14).  Along with this letter and the signed Paturick Amendment, Woltman enclosed a copy of her power of attorney and various pages of the then-current Restatement of the 1989 Trust.  (Id.).  None of the trust pages enclosed with the letter request revealed the Charitable Trust to be the residuary beneficiary of the 1989 Trust.  (Id.).  Woltman explained that she did not enclose a copy of the entire 1989 Trust because it was confidential; instead, it was her common practice to enclose only the pages of trust documents containing the conferred powers of the trustee and the signature page.  (3T:72:14-73:4).  She further testified that after submitting the letter and attachments to Huff, she did not receive any responses or objections.  She assumed for this reason that the "record was in order." (3T:74:1-12).

Aside from the "change-in-ownership" request in the September 1999 letter, Woltman never signed any documents formally transferring the Soroka Interest to the Trust, nor did she inquire what steps would be needed to do so.  (3T:74:18-24).  Unlike the executors of the Paturick estate, she did not make any representations or sign any acceptance document as required by §§ 8.1(B) or 8.3(D).  (3T:74:25-76:17).  Thornton, in fact, conceded at trial that Woltman did not formalize the attempted transfer or make the requisite representations. (2T:76:1-77:8).  Woltman stated that after she sent the September 1999 letter, no one from Huff

inquired into the nature of the Trust or why it was the recipient of the quarterly distributions. (3T:77:9-11).  Finally, Woltman acknowledged that upon receipt of the checks every quarter, the money was deposited into Soroka's trust account.  (3T:77:17-18).

It is unclear from the trial testimony through whose hands the September 1999 letter passed.  William Huff denied ever seeing it, stating that a letter like it should have been sent to Bassock.  (1T:67:11-68:9).  Bassock gave deposition testimony that he had received a copy of the letter either from William Huff or someone else.  (2T:91:16-92:1).  At trial, however, he denied knowledge or receipt of the letter.  (2T:91:3-6; 2T:94:21-95:1).  Thornton likewise testified that he did not see the letter in 1999. (2T:11:11-21).  Somehow, the letter eventually wound up in front of Josephine Carbone ("Carbone") (the "Josephine Long" Woltman had referenced in the letter), a human resources employee and minority Huff member.

Carbone testified that she had worked at Huff since the genesis of the partnership, and that she was responsible for payroll and issuing the members' quarterly checks.  (1T:81:19-82:18).  According to Carbone, she was "given a copy of the [September 1999 letter] to inform [her] that [she] needed to change" the payee of Soroka's quarterly distribution checks.  (1T:83:6-8).  She understood the letter to be an approval of the proposed Paturick Amendment and a request on Soroka's behalf to change the payee on the quarterly distributions to the 1989 Trust in the future.  (1T:83:17-19).  Carbone did not find this particularly unusual because Soroka had made similar requests to change the payee in the past, so she complied with Woltman's request and issued Soroka's checks in the name of the Trust.  (1T:84:2-13).  Her usual practice in disbursing the checks was to send them to Bassock's trading company, Roseridge Trading, which would then forward them on to the individual members.  (3:78:9-11).  She stated that she did not involve William Huff with the September 1999 letter because the request was simply

"going to the Soroka Trust . . . .  It was Mr. Soroka's Trust.  It wasn't Jane Doe or somebody else."  (1T:91:22-92:19).

As discussed above, Thornton denied ever seeing the September 1999 letter, but said that if he had, he would have thought it to be no more than an administrative request to change the payee's name.  (2T:15:6-11).  He stated that had he thought it to be requesting a formal transfer, he would have followed up with Bassock and Woltman to see what Soroka actually wanted.  (2T:15:19-16:5).  He stuck to this position on cross-examination:

> Q:  Don't you think somebody at the company had an obligation to do some due diligence and find out exactly what this transfer request for change of ownership was all about?
>
> A:  Looking on the face of this, again I don't recall seeing it.  It doesn't strike me as anything extraordinary if Josephine took it as [an] administrative direction, particularly since Ms. Woltman was attaching an amendment to effect a transfer.  She knew what needed to be done if she wanted it done and this is in 1999, as far as I know, nothing else happened until Mr. Soroka died many years later.
>
> Q:  You're saying Ms. Woltman knew what had to be done as to a transfer?
>
> A:  Yes.  She is acting on his behalf.  She's his fiduciary.
>
> Q:  Who created this amendment to the operation agreement?
>
> A:  I did.
>
> Q:  Sarah Paturick didn't prepare it, did she?
>
> A:  No, I did.
>
> Q:  So, if Ms. Woltman writes a letter to the company, saying, please change the ownership, would she get the same conversation that the Paturicks did that somebody would consider this and decide how to properly effectuate what this was?
>
> A:  If she had made that request and I was aware of it I would have discussed it with [William Huff].

(2T:57:9-58:8).

19

Almost three years after Woltman's September 1999 letter, Soroka's K-1 tax forms[9] continued to be issued in his individual name.  In response, and because Soroka was at that time in poor health, Woltman wrote to Roseridge Trading on October 1, 2002 (the "October 2002 letter") to "make sure that everything was in order" (3T:78:5-6):

> I am enclosing a copy of a request which I made on September 29, 1999 to transfer the ownership of William Soroka's partnership interest in W.R. Huff Asset Management to The William Soroka 1989 Trust.  I also requested that the distribution checks be forwarded to me and made payable to CSC for the account of The William Soroka Trust.  In reviewing the K-1 and the distribution checks which have been received, I noticed that these items are still being issued in the name of William Soroka.  Would you be kind enough to notify Josephine Long, or the correct person to make these changes on Mr. Sorokas' [sic] behalf?  I have also enclosed a copy of the Amendment to Mr. Sorokas' [sic] Trust where I have been appointed Trustee.

(Ex. P-15).  Woltman received no response to her October 2002 letter. (3T:78:20-22).  Bassock, the addressee (through Roseridge Trading), testified that he had never seen the letter and that he believed it to be a phony.  (2T:96:16-98:14).

### E.  Soroka's Death and The Aftermath

Four days after Woltman wrote the October 2002 letter, Soroka died.  Woltman testified that she did not promptly notify anyone at Huff of Soroka's death due to her responsibilities relating to Soroka's extensive dealings and the terminal illness of her daughter.  (3T:82:17-83:2; 3T:79:8-17).  She faxed the company a letter dated March 13, 2003, notifying the membership of Soroka's death.  (Ex. P-16).  The parties dispute when the letter was received—the company's fax printout contains a timestamp dated April 3, 2003.  In any event, Woltman visited Bassock at his office on March 11, 2003—two days before the letter was reputedly sent—and personally

---

[9] Schedule K-1 is an income-reporting schedule on Form 1065.  It is used by partnerships to report individual partners' income derived from membership in the partnership.

informed him of Soroka's passing.  (3T:83:3-18; 2T:95:23-96:1).  Bassock, in turn, informed Carbone of Soroka's death shortly after the brief meeting.  (2T:96:2-6).  Bassock testified that he also directed Woltman to call William Huff because he "was quite upset that he had died six months previous and we didn't know about it." (2T:86:5-9).  He stated that he did not know whether Woltman called William Huff, but that he immediately instructed his secretary to do so. (2T:86:10-12).

Meanwhile, disbursement of Soroka's quarterly checks continued.  On January 2, 2003, the check for the third quarter of 2002 was forwarded, per usual, to the 1989 Trust.  (Ex. P-109). Two additional checks were issued for the fourth quarter of 2002 and the first quarter of 2003, after the company had been advised of Soroka's death.  (Exs. P-17, P-18).

From the origin of the partnership, through the creation of the Trust in 1989, the 1994 conversion to LLC status, the death of Arthur Paturick and subsequent Paturick Amendment, and the purported transfer of the Soroka Interest—through all of this, quarterly checks were issued to Soroka's trust until the summer of 2003, when Joseph Thornton learned of Soroka's death. Thornton found out through "discussions with Ms. Woltman" and upon seeing the October 2002 letter about the K-1s that Soroka, through Woltman, had attempted to transfer his interest in Huff to a trust whose beneficiaries included non-family members (i.e., the Charitable Trust). (2T:17:5-12).  He testified that he "was a bit surprised because [he] hadn't known of any transfer [to the Trust]."  (2T:17:22-23).  He went back and reviewed the trust documents that Woltman had attached to the signed Paturick Amendment, and noted that they were incomplete. (2T:18:11-18).  Upon further review of an amended trust document that had accompanied the October 2002 letter, Thornton realized that the Trust terms devised assets (purportedly including the Soroka Interest) to a non-family member (the Charitable Trust).

Discussions commenced soon thereafter and proceeded throughout the summer of 2003 between Thornton, Woltman, and David Weston (counsel retained by Woltman) about whether the Soroka estate could become a member of the company despite the attempted transfer in 1999. Weston stated in a letter dated October 8, 2003 that it was his and Woltman's hope that the Soroka Interest would remain intact through the company's termination. (Ex. P-115). Thornton eventually informed Weston that due to the attempted transfer, the Operating Agreement called for Soroka's interest to be bought out at its then-current capital value as of the date of his death. (2T:32:17-25). Having reached an impasse, the company did not issue a disbursement check to Woltman for the second quarter of 2003.[10]  (2T:22:18-23:8).  Then, on December 16, 2003, Thornton sent a check to Woltman in the amount of $2,122,412.00, declaring it to be a calculation of the value of Soroka's capital account as of the date of his death, minus the amount of the post-death disbursements.[11]  (Ex. D-11).  Thornton's cover letter stated that the check was remitted in "full and complete accord and satisfaction" of Soroka's interest, and further stipulated that it was offered in full release of any claims that Woltman may have had on behalf of the Soroka Trust or Estate.  (Id.).  The calculation sheet attached to the cover letter also indicated that the accrual method had been used to determine Soroka's payout.  (Id.).  In a letter dated February 4, 2004, Weston, on behalf of Woltman, formally rejected the offer, returned the

---

[10]  Thornton's testimony can be read to imply that Huff did not cease issuing checks to the Trust until the disbursement for third quarter of 2003 became due (i.e., the company issued a check for the second quarter of 2003). (2T:18-21).  Exhibit P-18, however, shows that in June 2003, the company issued a check to the Trust for the first quarter of 2003.  (Ex. P-18).  Exhibit D-11 shows that Huff's settlement offer reduced Soroka's capital account only by the post-death amounts reflecting the fourth quarter of 2002 and the first quarter of 2003.  This demonstrates that the last disbursement (issued in June 2003) reflected payment for the first quarter of 2003.  (Ex. D-11.).  Thornton's testimony, therefore, should be understood in context as stating that the company ceased issuing checks after that payment.

[11]  The calculation did not deduct the amount of the disbursement for the third quarter of 2002—despite having been issued after Soroka died—presumably because Soroka had actually survived through that disbursement period.  (Ex. P-109).

check, and demanded that disbursement checks continue to be sent.  (Ex. D-14).  Huff then commenced this action against defendants.

## V.   DISCUSSION

### A.  The Parties' Positions

Huff advances three principal arguments in support of its claim that the Soroka estate owes the membership money and not the other way around.  First, it claims that Soroka's invalid attempt to transfer his interest in Huff to a non-family member triggered Huff's right to purchase the Soroka Interest as of September 29, 1999.  Alternatively, at the very least, Huff argues that it has redemption rights as of the date of Soroka's death (October 5, 2002), because Soroka's estate plans purported to leave his interest to a non-lineal descendant.  Finally, whatever the valuation date, Huff argues that the cash method of accounting must be used to calculate the redemption price, consistent with the terms of the Operating Agreement and the actual practice of the company.

Conversely, defendants first contend that under the Operating Agreement, Woltman's September 1999 letter did not effect a valid transfer of the Soroka Interest, and in any event, the Operating Agreement does not provide for any affirmative redemptive right triggered upon an attempted—but invalid—transfer.  Second, defendants argue that the Soroka Interest remained intact upon Soroka's death, and that it resided in Woltman (in her capacity as executor) through the windup of the company.  It follows, defendants assert, that the Soroka Interest should get the same treatment given to Arthur Paturick's interest upon his death.  Both arguments claim that the interest should be valued as of the termination date of the enterprise.  As to valuation, defendants argue that the Operating Agreement is silent about what accounting method to use in calculating

the members' capital accounts upon termination, and that the nature of calculating the value of the interests upon withdrawal or termination demands use of the accrual method.

Reducing their positions to numbers, the parties have stipulated to alternative outcomes depending on the Court's decision.  Should Huff prevail, it will be entitled to either $6,242,016.00 as of September 29, 1999 (the day Soroka allegedly breached the Operating Agreement), or $139,399.00 as of October 5, 2002 (the day Soroka died).  Alternatively, the parties have agreed that should defendants prevail, they will be entitled to either $8,276,114.00 under the accrual method, or $6,564,698.00 under the cash method.  (3T:3:2-4:25).[12]

### B.  Principles of Contract Interpretation

Delaware courts follow a traditional mode of contract analysis.  There, courts

> adhere[] to the "objective" theory of contracts—a contract's construction should be that which would be understood by an objective, reasonable third party.  Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language.

Hifn, Inc. v. Intel Corp., 2007 Del. Ch. LEXIS 58, No. 1835, at *29 (Del. Ch. May 2, 2007) (internal citations and quotations omitted); see also Haft v. Haft, 671 A.2d 413, 417 (Del. Ch. 1995).  Where a "contract is unambiguous in its language, [a] [c]ourt [must] not proceed to interpret it or to search for the parties' intent behind the plain language employed. [It], of course, must construe the document as a whole."  Hillman v. Hillman, 910 A.2d 262, 270 (Del. Ch. 2006) (quoting Hibbert v. Hollywood Park, Inc., 457 A.2d 339, 343 (Del. 1983)).  The words contained in the Operating Agreement must be "construe[d] . . . as [they are] written, and language which is clear, simple, and unambiguous [must be given] the force and effect required."  Hibbert, 457 A.2d at 343.

---

[12] The parties appear not to have stipulated to an accrual calculation should plaintiff prevail.

### C.  Estoppel Issues

Plaintiff first argues that because Soroka purported to transfer his interest to the 1989 Trust, and thereafter represented in Nevada probate proceedings and on federal income tax returns that the interest resided in the 1989 Trust, defendants are judicially estopped from now arguing otherwise.  Plaintiff cites <u>In re Chambers Dev. Co.</u>, <u>see</u> Pl. Br. at 14, in which the Third Circuit described the doctrine as follows:

> Judicial estoppel, sometimes called the doctrine against the assertion of inconsistent positions, is a judge-made doctrine that seeks to prevent a litigant from asserting a position inconsistent with one that she has previously asserted in the same or in a previous proceeding. It is not intended to eliminate all inconsistencies, however slight or inadvertent; rather, it is designed to prevent litigants from playing fast and loose with the courts.

<u>In re Chambers Dev. Co.</u>, 148 F.3d 214, 229 (3d Cir. 1998); <u>see also</u> <u>Capaldi v. Richards</u>, No. 1966-N, 2006 Del. Ch. LEXIS 209, at *5 n.7 (Del. Ch. Ct. Aug. 9, 2006) (citing <u>New Hampshire v. Maine</u>, 523 U.S. 742, (U.S. 2001) ("Because the rule is intended to prevent improper use of judicial machinery, judicial estoppel is an equitable doctrine invoked by a court at its discretion.")).  Plaintiff argues that because the position taken in the Nevada proceeding (that the interest was transferred validly) is inconsistent with the position taken here (that it was not), defendants by law may not advance the latter argument.  Defendants refute this argument by claiming that plaintiff did not detrimentally rely on the prior representation and cannot take advantage of the general estoppel doctrine. Quoting <u>Reisen Lumber & Millwork Co. v. Simonelli</u>, 98 N.J. Super. 335, 342-43 (Law Div. 1967), defendants contend that "one of the necessary elements of proof required of the party seeking to invoke the doctrine of estoppel is that he in good faith relied upon the conduct, act, or representation of the other party."  But <u>Reisen Lumber</u> presented the question whether liability under an implied partnership could be

imposed using an estoppel theory.  Id.  The quoted language above relates to *partnership*-by-estoppel, not *judicial* estoppel.

Plaintiff correctly notes that "the party asserting judicial estoppel 'is not required to demonstrate detrimental reliance upon the prior representation.'" Pl. Br. at 14 (quoting Chambers, 148 F.3d at 229).  However, the Third Circuit also stated the following in Chambers:

> [It] will not apply where inconsistent positions are asserted in good faith or through inadvertence.  Asserting inconsistent positions does not trigger the application of judicial estoppel unless intentional self-contradiction is used as a means of obtaining unfair advantage. Thus, the doctrine of judicial estoppel does not apply when the prior position was taken because of a good faith mistake rather than as part of a scheme to mislead the court. An inconsistent argument sufficient to invoke judicial estoppel must be attributable to intentional wrongdoing.

Chambers, 148 F.3d at 229 (internal quotations omitted); see also Capaldi, 2006 Del. Ch. LEXIS 209, at *8 n.12.  The court then repeated the often-quoted reason behind the rule:  it sanctions those "who act with the intent to play fast and loose with the courts."  Chambers, 148 F.3d at 229 (internal quotations omitted).

This Court can find no evidence that defendants were playing "fast and loose with the courts" in their prior positions or representations.  Furthermore, plaintiff does not allege bad faith or a deceptive motive in its summation brief; in fact, plaintiff defeats its own argument by citing two letters that Woltman wrote in December 2002 and March 2003.  See Pl. Br. at 13-14.  The first, written to Larry Kahan (counsel for Woltman), states that Soroka's interest "is recorded in the name of the Soroka Trust . . . ." (Ex. P-126).  The second, written to the company, advises that Soroka had died, and states that all of his assets were then held in the 1989 Trust.  (Ex. P-16).   Additionally, Woltman's own testimony at trial corroborated her belief that the interest did in fact reside in the 1989 Trust.  (3T:81:21-82:1-2).  This evidence fails to demonstrate that that

Woltman intentionally represented two different things to two different tribunals.  If anything, Woltman's statements are consistent with a "good faith mistake rather than as part of a scheme to mislead the [C]ourt."  <u>Chambers</u> 148 F.3d at 229.

Likewise unavailing is defendants' argument that plaintiff should not be permitted to argue that it may redeem the Soroka Interest because it failed to take timely action after it received Woltman's September 1999 letter.  Defendants accuse plaintiff and its principals of buck-passing and violating their fiduciary obligations under the Operating Agreement.  The Court finds, however, that plaintiff's failure to take timely action in response to the September 1999 letter was taken in good faith and not in derogation of its fiduciary responsibilities.  When Josephine Carbone received the letter, she believed that it was nothing more than a simple administrative matter.  Joseph Thornton corroborated Carbone's belief that even if they had seen the letter, it would not have raised any red flags signaling a possible breach of §§ 8.1(B) or 8.2(A).  Similar requests to change the payee had been honored in the past.  (Exs. P-152, P-153, P-154).  Finally, Woltman admittedly did not include in the papers accompanying the September 1999 letter the provisions that demonstrated that the 1989 Trust bestowed the Soroka Interest to a non-family member.

For these reasons, the Court rejects the parties' waiver and estoppel arguments.  It now discusses whether the Operating Agreement permitted plaintiff to redeem the Soroka Interest as a result of the attempted transfer.

### D.  Conclusions of Law

  1. <u>Plaintiff is Not Entitled to Redeem Soroka's Interest as a Result of the September 1999 Letter</u>

Plaintiff argues that it may redeem the Soroka Interest as of September 29, 1999 because Soroka (acting through Woltman) breached the Operating Agreement when Woltman requested

that the Soroka Interest be transferred to the 1989 Trust and that the quarterly checks be made to the 1989 Trust.  The Court disagrees.

### a.  The Purported Transfer by the September 1999 Letter was Void

The plain language of several coordinated provisions in the Operating Agreement reveals that an attempted—but invalid—transfer is null and void under the contract.  Section 8.1(B) states in pertinent part:  "Each member agrees that he will not sell, assign, pledge, hypothecate, place in trust or otherwise transfer ("Transfer") his Interest or any fraction thereof as otherwise permitted under this Agreement . . . .  Any such attempted Transfer in violation hereof *shall be void*."  (Ex. P-1 at 22-23) (emphasis added).  Under this provision, any attempted transfer noncompliant with the protocol mandated by the Operating Agreement is void.  Section 8.1(B) itself lays out part of this protocol for effecting a recognizable transfer:  each transferee must "similarly represent and warrant and similarly agree not to Transfer such Interest or fraction thereof to any Person who does not so represent and warrant and agree."  (Ex. P-1 at 22-23).

Additional conditions precedent for the execution of a valid transfer appear in other sections of the Operating Agreement.  Section 8.2(A), using the term "Transfer" as it is defined in § 8.1(B), states that "no interest . . . may be Transferred" without first offering it to the membership.  (Id. at 23).  If no member desires to purchase the interest, only upon a two-thirds vote of the membership can the interest be passed to a non-member.  Id.  Additionally, § 8.3(D) instructs that a transfer will only be formally recognized as valid upon certain pre-conditions.  First, the parties to a transfer must have complied with Article 8.  (Ex. P-1 at 25).  Second, a written and dated notice must have been filed with the company documenting the transfer.  (Id.).  Finally, that notice must have contained the acceptance by the Transferee of all terms and

provisions of the Operating Agreement, and representations that the transfer complied with all provisions of the Agreement and other governing laws.  (Id.)

Reading these provisions together, it is apparent that the voiding clause in § 8.1(B) is not self-contained; another explicit limitation under that section is that a proposed transfer must be "otherwise permitted under th[e] [Operating] Agreement" before it will be recognized as valid. (Ex. P-1 at 22.).  Reading the agreement as a whole, the clause voiding transfers "in violation hereof" refers not only to § 8.1(B) itself, but also to those provisions setting forth the elements of a valid transfer.  Sections 8.1(B), 8.2(A), and 8.3(D) therefore, are logically interwoven—if one attempts to transfer his or her interest without meeting the requirements of § 8.2(A) or § 8.3(D) (or § 8.1(B) itself), then that transfer is rendered void by virtue of § 8.1(B).

Only upon satisfaction of these interrelated subsections does a transfer pass muster, and Woltman's letter complied with none of them.  Woltman did not make the representations required by § 8.1(B) or §8.3(D), nor did she first offer the interest to the membership in compliance with § 8.2(A).  For these reasons, § 8.1(B) nullified the transfer.  Joseph Thornton, who drafted the provisions, agreed with this much during his testimony:

> Q:  And no such representations were made in this case, correct?
>
> A:  Not to my knowledge.
>
> Q:  And [it] goes on to say any such attempt to transfer in violation hereof shall be void, correct?
>
> A:  That's correct.
>
> Q:  And is it safe to say that since no representations were made if this was in fact an attempt to transfer that never happened because it was void under the provision?
>
> A:  The transfer in '99?
>
> Q:  Right.

A: Well, that's different because it would have been under operation of law—I'm sorry—wrong one.  In '99 it would have been, if she wanted a transfer then, she would have [to] make this representation, yes.

Q:  So if we can construe her letter as an attempt to transfer, it was void, correct?

A:  Absent that representation it would have been.

(2T:76:14-77:8).

Plaintiff and defendants do not dispute that the transfer is void under § 8.1(B).  See Plaintiff's Br. at 14; Def. Br. at 16-18.  The Court need go no further:  the Operating Agreement's language confirms, and the parties are in accord, that the September 1999 letter failed to transfer Soroka's interest to the 1989 Trust.

The issue becomes whether Huff has rights to redeem as of that date.

### b.  The Operating Agreement Does Not Give the Company Automatic Redemption Rights upon an Attempted—but Invalid—Transfer

Huff argues that because Soroka breached the Operating Agreement by attempting to transfer his interest to an outsider without first offering it to the membership, it is entitled affirmatively to redeem the Soroka Interest as of the date of the alleged breach.  The predicate for this argument is the requirement in § 8.2(A) that a member offer his interest to the membership before transferring the interest to an outsider.  Huff contends that § 8.2(A) gives it a redemption right because Soroka unsuccessfully attempted to transfer an interest in contravention of the Operating Agreement.  See Pl. Br. at 10-11; 14-15.

The Court fails to see how the language of agreement supports Huff's argument.  Nowhere in § 8.2(A) (or anywhere else for that matter) does the Operating Agreement state that upon an attempt to transfer one's interest in violation of the agreement, the company would have the right to remove a member by purchasing his interest.  The operative clause simply states that "[n]o Member's Interest of any fraction thereof may be Transferred or withdrawn without first

30

offering such Interest to all other Members."  (P-1 at 23).  This clause is a classic right of first refusal, defined as a "contractual right to meet the terms of a third party's offer."  Dictionary of Modern Legal Usage (2nd ed. 1995).  In other words, § 8.2(A) gives the company the contractual entitlement to override a proposed transfer to a non-member by purchasing for itself the interest to be transferred.  Literally, the terms of the provision do not give any right whatever to the company to purchase an interest upon a *voided* transfer.  The Court therefore agrees with defendants that § 8.2(A) should not be read to give Huff the power to elbow out a member upon his attempt to effect a transfer that was rendered legally void by a separate contractual provision.  See Def. Br. at 18.  A contrary conclusion would be writing into the Operating Agreement a penalty clause not appearing in the Agreement executed by the members.

However much a penalty might be wished for now, or appropriate then, the Operating Agreement is drafted so that if a non-compliant transfer is attempted, it is simply void and the member's entitlements continued as if the attempt had never been undertaken.  As such, notwithstanding and subsequent to Woltman's September 1999 letter, Soroka retained full title to his membership interest in Huff.  In the absence of operative language in the agreement, Huff's argument invites the Court to write in a penalty provision, which it cannot do.  "[I]t is not within [the Court's] purview to add unilaterally to the terms of an agreement . . . ."  Council of the Dorset Condo. Apts. v. Gordon, 801 A.2d 1, 8 (Del. 2002).

The reading more consonant with the language and intent of § 8.2(A) is this:  before any member can transfer his or her interest to an outsider, he or she must first offer it to the membership.  Any other member then has the right to purchase the interest, in order to prevent an outsider from becoming a member.  The membership could, of course, permit a new member

to enter by a two-thirds membership vote, which is precisely what happened when the members signed the Paturick Amendment in 1999.

If: (1) no member wishes to purchase the interest; (2) the transferring member does not wish to withdraw pursuant to Article Seven of the Operating Agreement; and (3) a two-thirds vote cannot be mustered, then a transfer is not permitted. If the member purports to transfer his interest anyway, such transfer is void under § 8.1(B). Nothing in the foregoing suggests that Huff had the power to take away a member's interest upon a failed attempt to transfer the interest.

Not only would accepting plaintiff's interpretation be tantamount to adding a provision not appearing in either the original partnership agreement or the amended LLC version, it would permit the company to oust a member upon technical default of the requirements set forth in § 8.2(A). Plaintiff's argument, relying on a "breach" of the Operating Agreement to "trigger" its supposed redemptive rights, would permit such severe overreaching. See Pl. Br. at 14. Taken to its logical extreme, plaintiff's interpretation would permit redemption of a member's interest upon the technical breach of any provision in the 34-page Operating Agreement. Wholly apart from the clear language in the document, the Court will not countenance such an unreasonable reading of the Operating Agreement.

Plaintiff argues that defendants may not use the voiding clause in § 8.2(A) as a shield to preclude the company's redemption rights after an invalid transfer. See Pl. Br. at 14-15. But plaintiff's cited authority provides no escape from the fact that the Operating Agreement does not contain a redemption provision. It is true, as plaintiff states, that a "contractual prohibition of assignment of contract rights ordinarily serves to protect the obligor alone and does not affect the legal or equitable rights of the assignor and assignee as between themselves." Paul v.

Chromalytics Corp., 343 A.2d 622, 626 (Del. Super. Ct. 1975).  But this is inapposite.  The quoted language in Paul and other cases cited by plaintiff concerns whether a particular transfer can be voided, not whether the obligor has any independent right under the contract against the breaching assignor.  The court in Paul stated only that "obligor, of course, may gain, from a valid and unwaived non-assignability provision, the prerogative *to resist or even nullify the assignment*.  However, if the assignor should collect the assigned claim, he would be bound to pay what he had collected to the assignee."  Id. (emphasis added).  But the invalidity of the attempted transfer is not in dispute—by all accounts the transfer was void.  The issue here is whether the company had the right affirmatively to redeem the Soroka Interest.  Again, nothing in the agreement provides for that contingency.  The fact that an assignee might have recourse against an assignor notwithstanding an anti-assignment clause does not help plaintiff here.

In sum, § 8.2(A) sets forth conditions precedent to a valid transfer and not, as plaintiff repeatedly argues, a redemptive option "triggered" when a member does not comply with the Operating Agreement's transfer prescriptions.  When such a situation occurs, the remedy is simple: no transfer occurs, and the parties continue about their business.  The Court concludes that to find an affirmative right of redemption upon a member's invalid attempt to transfer his interest would be to rewrite the Operating Agreement and otherwise permit manifest injustice.  It declines to make that finding here.  Plaintiff does not have the right to repurchase the Soroka Interest as of the date of Soroka's "breach" of § 8.2(A).

### 2.  Soroka's Interest Remained Intact After his Death

Plaintiff argues that it should be able to redeem the Soroka Interest, at the very latest, as of October 5, 2002 (the date of Soroka's death) because the pour-over provision in his will devised everything to the 1989 Trust (including his interest in Huff), which in turn devised

everything (save for specific monetary bequests to family members) to non-lineal beneficiaries, in violation of §8.2(A). The Court disagrees for three inter-related reasons.

The Court has already discussed the first—there is no provision in the Operating Agreement, express or implied, granting affirmative redemption rights to plaintiff when a member attempts to effect a transfer that is automatically void under § 8.1(B). This is true regardless of the date of the attempted transfer. Whether § 8.2(A) was breached on September 29, 1999 or October 5, 2002 is immaterial for purposes of redemption, because no redemption rights exist in the first place. Second, the relevant subsection of the Operating Agreement unequivocally granted Woltman the power to transfer Soroka's post-mortem interest, and an invalid attempt to do so does not disturb her right to step into Soroka's shoes upon his death. Third, Huff's treatment of Arthur Paturick's interest provided an historic roadmap for dealing with the death of a member; indeed, the amendments to the 1984 agreement set forth in §§ 8.2(A), 8.2(B), 8.3(A), and 8.3(D), together with the 1999 amendment to the membership list (adding the Paturick estate)—language that was drafted specifically to protect Paturick's estate planning goals—wrote the map. Huff has not made a convincing case for treating Soroka's estate differently.

### a.   Section § 8.3(A) is Clear and Unambiguous

Section 8.3(A), a provision added during the 1994 conversion to LLC status, is the only executory provision triggered upon the death of a member. It states:

> Upon the [death] of a Member, his executor, administrator, trustee, committee, guardian, conservator, or receiver of his estate, as the case may be, shall have all the rights of a Member for the purpose of settling or managing his estate, receiving distributions of profits and/or losses from the Company and, subject to Section 8.2, such power as the Incapacitated member possessed to Transfer all or any part of his Interest and to join with such Transferee in

satisfying conditions precedent to such assignee becoming a Substituted Member.

(Ex. P-1 at 24-25).  This language could not be any more plain.  When a member dies, his representative retains all rights that the decedent had as a member, *including the right to transfer an interest* subject to those standards appearing in § 8.2(A).  As discussed above, § 8.2(A) sets forth restrictions on transfers, which were designed to implement William Huff's desire to keep the investment venture exclusive and unregulated.  But the restrictions do not on their face override an executor's retention of all powers that the member held upon his or her death.  Because the power of an executor is coextensive with that of a member upon his death, any attempt by the executor during administration of the estate to transfer the interest in violation of § 8.2(A) renders the transfer void—just as it would if the member himself attempted the invalid transfer.

The Court has found above that Woltman's 1999 letter did not create a termination event, or confer a redemption right upon the membership.  Is there any reason to find otherwise regarding the provisions in Soroka's will insofar as it devised his interest to an ineligible transferee?  The Court sees nothing in the Operating Agreement or the legal authority upon which Huff relies for arriving at such a conclusion.  It appears instead that the generous grant to executors in § 8.3(A) gave Woltman the right to "receiv[e] distributions of profits or losses from the Company" coterminous with her activities in "settling or managing" Soroka's estate.  (See id. at 24-25).  Given the record evidence that reflects Woltman's ongoing responsibilities in winding up the estate, under the Operating Agreement she, as Soroka's executor, maintained entitlement to receive distributions until Huff's 2004 dissolution.

According to plaintiff's summation brief, this conclusion permits an executor to "hold Soroka's interest hostage" until the estate is closed.  Pl. Br. at 10.  Further:

> Section 8.3(A) is just a technical provision that allows Woltman, as executor, to step into Soroka's shoes as of the date of his death, and wind up his affairs.  Since Soroka could not have transferred his interest in the Company to the charitable trust without triggering the redemption rights of Section 8.2(A), neither can Woltman.  And, Woltman cannot avoid Section 8.2(A) merely by delaying the transfer of Soroka's estate to its intended beneficiary.  To rule otherwise would elevate form over substance, and empower an executor—by definition, an outsider to the deal—to circumvent the members' intent to closely control who could and who could not hold the interests in the Company.

Id. at 11.  First, plaintiff's argument begs the question by assuming that the company held redemptive rights under § 8.2(A) when a member (or executor) attempts to make an invalid transfer.  The Court has ruled that it does not.  Woltman did not "avoid" § 8.2(A) by administering Soroka's estate because § 8.1(B) had already nullified the attempted transfer for failure to comply with § 8.2(A).  The most faithful and equitable construction of the Operating Agreement is one that adopts defendants' interpretation:  upon a member's death, and notwithstanding that member's estate planning, the Agreement creates a "post-mortem status short of a 'transfer.'"  See Def. Br. at 11.  Otherwise, § 8.3(A) would have no meaning.  The facts demonstrate that this language was drafted to safeguard Paturick's interest.  The entitlements created by § 8.3(A), however, afford Soroka no less protection.

Second, plaintiff argues that permitting an "outsider" executor to continue receiving distributions through the life of the company would be unfair.  But this ignores the fact that it is an explicit provision in the Operating Agreement.  While an executor is an "outsider" in the sense that he or she is not an original member, the framers of the Operating Agreement protected the members by permitting their executors to assume the day-to-day activities at their death; otherwise they would not have included § 8.3(A).  Huff provides no authority from Nevada probate law that imposes a timetable upon an executor to close an estate.  Nor is there anything

in the Operating Agreement that would require the executor to hustle in order to decrease the number of quarterly checks due from Huff.  The clear purpose of § 8.3(A) is to permit an executor, on the deceased member's behalf, to continue to reap the benefits of his wise investment while performing the duties of executor.  If that was not the case, then the clause in § 8.3(A) granting the power to "receiv[e] distributions of profits and/or losses from the Company" would be granting no real power at all.

Third, Huff has failed to provide evidence in any event that Woltman was derelict in her duties as executor of the Soroka estate.  To the contrary, the evidence shows that Woltman had good reason to keep the Soroka estate open through December 31, 2004—the administration of the Soroka estate involved multiple civil actions, and the estate is in fact still open, pending this and another legal dispute still in process at the time of this trial.  (3T:94:5-12).

Finally, the Court notes that Joseph Thornton, a principal drafter of the 1994 Operating Agreement in which § 8.3(A) first appeared, agreed that an interest resided in the executor upon the death of a member.  (2T:54:13-55:2); see also Section IV.B.2, supra.

For all of these reasons, the Court concludes that § 8.3(A) explicitly and unambiguously established Woltman's right to step into Soroka's shoes upon his death and continue to receive his quarterly distributions, and that under the language of the Operating Agreement and the record evidence, there was no point in time when Woltman lost that power.

### b. The Paturick Precedent and Equitable Considerations Compel Identical Treatment of the Soroka Interest

As the Court noted in its factual findings, as of Soroka's death in October 2002, Huff had prior experience in dealing with the death of a member, Arthur Paturick.  Upon Paturick's death, his executors assumed control over his interest in Huff for more than two years before the

Paturick estate was formally substituted in as a member pursuant to § 8.2(A)(ii).  The Court sees no reason to treat the Soroka Interest any differently.

Plaintiff asserts that Paturick and Soroka differ fundamentally because of the parties to whom they granted (or in Soroka's case, attempted to grant) their membership interests.  Because, plaintiff argues, Soroka left his interest to a non-family member, the redemption rights in § 8.2(A) were triggered, whereas in Paturick's case a valid transfer was effected.  In other words, plaintiff argues that because the Operating Agreement allows for unilateral familial transfers but not unilateral transfers outside the family, the treatment of Paturick and Soroka need not be the same.  In support of its argument, plaintiff relies on § 8.2(B) of the Operating Agreement, which states, "Notwithstanding the foregoing, Section 8.2(A) shall not apply to the assignment by a Member of his right to share in profits with respect to his Interest to a spouse or lineal descendant (each, a "Family Member") a trust for the benefit of one or more Family Members, or a partnership comprised solely of Family Members . . . ."  (Ex. P-1 at 24).

The Court disagrees that § 8.2(B) affects the operation of § 8.3(A), which deals explicitly with the death of a member.  The reason the transfer of the Paturick Interest was permitted is not because § 8.2(B) validated it; it is because two-thirds of the membership voted to permit Paturick's estate to become a member, in accord with § 8.2(A)(ii).  Until that time, Paturick's executors operated under § 8.3(A) and not under a provision permitting wholesale transfers to family members.  In this regard, defendants correctly point out that § 8.2(B) does not permit unilateral *transfers* of one's legal interest in Huff to a family member; it deals with *assignment* of profits or income to family members.  A transfer of a legal interest is very different from an assignment of the profits or income derived from that interest.  See, e.g., Lusk v. Elliott, No. 16326, 1999 Del. Ch. LEXIS 172, at *7-8 & n.9 (Del. Ch. Aug. 13, 1999) (discussing critical

difference between a transfer of an entire LLC membership interest and the beneficial financial interest underlying the asset); United States v. Maginnis, 356 F.3d 1179, 1185-86 & n.7 (9th Cir. 2004) (discussing in the income tax context the analytical and legal distinction between "transfers of income rights and transfers of underlying assets").

Plaintiff's reading of the Operating Agreement would render superfluous the clause in § 8.2(B) stating that "such [family] assignee shall not be admitted to the Company as a Member unless the consent requirements set forth in [§ 8.2(A)(ii)] shall have been satisfied." (Ex. P-1 at 24). Instead, the Court reads § 8.2(B) to prevent an outsider who is transferred only an assignment of income rights from becoming a member without meeting the requirements of § 8.2(A)(ii). Put another way, § 8.2(B) permits the unchecked assignment of income from an interest in Huff to a family member, but does not permit a member to transfer the interest itself to a lineal descendant (or anyone else) without first going through the rigors of § 8.2(A).

Plaintiff's argument is not supported by the definitional language contained in § 8.1(B). Huff asserts that any legal distinction between an assignment of rights and a transfer of the underlying interest is eliminated under the definition of "Transfer" in § 8.1(B) because the definition includes the term "assign." But that subsection defines "Transfer" to include the sale, assignment, pledge, hypothecation, placement in trust or otherwise of the interest itself. (Ex. P-1 at 22-23). It does not govern the assignment of income derived from the interest. Moreover, insofar as the term "Transfer" is expressly defined in § 8.1(B), it would make sense to continue use of that term in § 8.2(B) (the next subsection) if the framers of the Operating Agreement intended it to pertain there as well. Instead, § 8.2(B) uses different language—"assignment . . . of [the] right to share in profits with respect to [an] Interest." (Ex. P-1 at 24). The interpretational maxim *expressio unius est exclusio alterius* applies here. See Henderson v.

Morrone, 214 Fed. App'x 209, 213 (3d Cir. 2007) ("The doctrine . . . instructs that when certain matters are mentioned in a contract, other similar matters not mentioned were intended to be excluded.").  Because the assignment language contained in § 8.2(B) does not encompass, or even reference, the definition of "Transfer" in § 8.1(B), the Court concludes that the assignments at issue in § 8.2(B) did not concern the transfer restrictions set forth in § 8.2(A).  To transfer an interest itself, however, satisfaction of § 8.2(A) was required.

The Court's conclusion that § 8.2(B) does not permit unrestricted inter-lineal transfers does not disturb the framers' obvious intent to permit members to pass their interests on to family members.  The 1994 memorandum outlining the conversion to LLC status expressly describes as much.  The Court's ruling simply means that § 8.2(B) is not the provision that effects that intent.  This finding is also in harmony with the treatment of the Paturick Interest.  If § 8.2(B) really permitted unilateral transfer of one's interest to family members, there would have been no reason to amend the Operating Agreement to include Paturick's estate as a member.  During the two years immediately after Paturick's death, his executors, stepping into his shoes pursuant to § 8.3(A), could have transferred the interest directly to his wife (the beneficiary of his estate).  Instead, the executors held post-mortem control over the interest for over two years, and then the estate became a member by a two-thirds membership vote.  This is even more evidence that to execute a valid transfer of one's entire legal interest in Huff, even to a family member, § 8.2(A)(ii) must have been satisfied.

Plaintiff attempts to distinguish the Paturick Precedent on three additional grounds: (1) Woltman failed to notify the company of Soroka's death for six months; (2) Woltman did not acknowledge that the Soroka estate was bound by the Operating Agreement; and (3) Woltman did not immediately disclose Soroka's plans to transfer the interest to the Charitable Trust.  But

these complaints have nothing to do with the fact that § 8.3(A) mandates that a decedent member's interest resides in his executor, and that the executor is vested with the same power as the member himself.  Even if plaintiff could establish a good reason to treat Paturick and Soroka differently (and the Court does not so find), the Court's ruling that § 8.2(A) does not contain redemptive rights upon a "breach" of the transfer restrictions renders the distinction one without a difference.  Under both the September 1999 letter and Soroka's estate plans, the attempted transfer was void.  Thus § 8.3(A) required the Soroka Interest to remain under Woltman's control irrespective of any differences in Paturick and Soroka's estate plans.  (2T:51:9-13).  Joseph Thornton admitted that § 8.2(B) did not disturb the requirement that the membership formally vote on the inclusion of the executors of Paturick's estate as members.  Woltman, then, held the same entitlements that Paturick's executors held before his estate was formally introduced into the membership.

For all of the reasons discussed above, the Court finds that the Soroka Interest was at all times relevant to this dispute under the legal control of either Soroka or Woltman.  The attempted transfer was rendered void by operation of contract, and affected neither Soroka's rights while he was alive nor Woltman's rights under § 8.3(A) thereafter.  The Court holds that the Soroka Interest terminated no earlier than December 31, 2004, the date on which the venture concluded.  Therefore, defendants are entitled to the value of Soroka's capital account as of that date.

### 3. Calculation of the Soroka Interest Using the Cash Method is Appropriate

By all accounts, the investment enterprise that William Huff started in 1984 operated under cash method accounting principles throughout its existence.  Its tax returns were prepared on a cash basis.  Quarterly payments to the members were recorded on a cash basis.  The

members' K-1 statements reflected cash-based accounting. The company's books were kept on a cash basis. Defendants now argue that final withdrawal is somehow different than any other aspect of the operation, and that because accrual method accounting makes the most sense, they should receive the value of the Soroka Interest as of December 31, 2004 using that accounting method. The Court cannot agree.

The testimony of Michael Gavin, defendants' expert, is unhelpful to either side at best or skews in favor of plaintiff at worst. Gavin did not successfully refute the company's historical practice or the language of the Operating Agreement as amended in 1994. Upon cross-examination, Gavin conceded that cash method accounting is often advantageous, and that he did not know the particulars of Huff to formulate whether cash or accrual was more beneficial:

> Q:  You can't tell us as you sit here today whether from the business perspective for the Huff company to use a cash method of accounting versus the accrual method, correct?
>
> A:  Correct.
>
> Q:  Now, I believe you also testified that it's generally advantageous for a company to maintain its books on a cash basis for tax purposes, correct?
>
> A:  Generally advantageous, yes.

3T:16:7-18:1. Gavin also stated that he had never prepared accounting or consulting services for an entity with a business model like Huff's. (3T:15:25-16:6). Finally, he admitted that his opinion as to cash or accrual method would have changed if he had known that the members agreed to be cashed out under cash method principles. (3T:25:10-25).

Nonetheless, defendants argue that it is "reasonable and equitable" to use the accrual method for departing members. But just as the Court has concluded that equity demands equal treatment between Paturick and Soroka, so to should it require that the Soroka Interest be cashed out in the same manner as every other member's interest. The members have stipulated that they

are entitled to receive the balance of their capital account as of December 31, 2004 on a cash basis, have received a portion of the money under that method, and will receive the remainder upon the disposition of this litigation on a cash basis as well.[13]  Defendants may not cherry-pick extra-contract provisions according to their liking (which, not coincidentally, would award them over $1.5 million extra) and simultaneously emphasize that the Court should focus on the contract as written.  Considerations of fairness tilt in favor of the cash method.

Next, defendants argue that because Huff used accrual method accounting on an internal basis, the founders "evidently considered the members to have some ownership interest in accrued income."  Def. Br. at 29.  But use of an internal monitoring mechanism does not mean that the Operating Agreement required accrual method withdrawal.  The internal accounting was simply used as a forecasting tool to keep the company apprised of how much and when money would be coming in.

Likewise, the fact that the original partnership agreement called for accrual method accounting is irrelevant for two reasons.  First, despite the agreement, the partnership operated on a cash basis in fact.  Second, one of the express reasons for converting to LLC status and executing a new agreement was to formally change the official accounting method to the cash method.

Finally, defendants argue that because Thornton's December 16, 2003 settlement offer contained a calculation under the accrual method, the accrual method should be used.  The Court, however, is unpersuaded that Thornton's letter was a correct characterization of the company's operating provisions.  See Pl. Br. at 21-22.  Thornton was not aware of the accounting method that had been used in generating Soroka's capital account for purposes of a settlement offer.

---

[13] The members have been cashed out for 50% of their interests.  The other half consists of a reserve fund for purposes of satisfying a judgment in this litigation.  (2T:107:6-10; Ex. P-108).

Instead, he requested that Josephine Carbone obtain from the company's accountants a calculation of Soroka's capital account.  In so doing, he did not specify whether he wanted the calculation done on a cash or accrual method.  (1T:96:18-20).  Thornton was not privy to Huff's financials at the time, and thus had insufficient knowledge to speak for the company with respect to the appropriate accounting method.  (2T:34:4-9).  The Court is satisfied that the settlement offer from Thornton using the accrual method was an error and nothing more.

The Court finds that the Soroka Interest is properly calculated using the cash method.

## VI.    CONCLUSION

Plaintiff filed this declaratory judgment action seeking a ruling from the Court that it was entitled to purchase the Soroka Interest upon his attempted transfer to a non-member, and additionally that the Soroka estate must disgorge distributions made to Soroka before his death and to his estate after his death.  For the foregoing reasons, the Court rejects plaintiff's position and declines to issue such a ruling.

Defendants counterclaimed, also seeking a declaratory judgment that Huff remained liable to make quarterly distributions to the Soroka estate.  For the foregoing reasons, the Court will enter judgment for defendants.  It concludes that the Huff Operating Agreement entitled the Soroka estate to receive distributions through the termination of the company, and that his capital account, as it stood on December 31, 2004, should be calculated using cash method principles.

An appropriate Order will accompany this Opinion.


/s/  Katharine S. Hayden

KATHARINE S. HAYDEN
UNITED STATES DISTRICT JUDGE